**In re Bradley T. SMITH, Debtor.**

No. 05–74493.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division at Columbus.

Feb. 12, 2007.

W. Mark Jump, Columbus, OH, for Debtor.

Steven J. Levine, Chicago, IL, for U.S. Securities and Exchange Commission.

Frank M. Pees, Worthington, OH, Chapter 13 Trustee.

## MEMORANDUM OPINION ON MOTION TO DISMISS OR CONVERT CHAPTER 13 CASE

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

Section 109(e) of the Bankruptcy Code provides that only a debtor who "owes, on the date of the filing of the [bankruptcy] petition, noncontingent, liquidated, unsecured debts of less than $307,675" is eligible for Chapter 13 relief. 11 U.S.C. § 109(e).[1] On October 14, 2005 ("Petition Date"), Bradley T. Smith ("Smith" or "Debtor") filed his Chapter 13 petition. On the Petition Date, Smith was a defendant in a pending civil enforcement action brought by the United States Securities and Exchange Commission ("SEC") in the United States District Court for the Southern District of Ohio ("District Court"). In the District Court action,[2] the SEC alleged that Smith had violated the anti-fraud provisions of federal securities laws and sought, in addition to other forms of relief, recovery from the Debtor of more than $2 million. Less than two months after the Petition Date, the District Court entered judgment against Smith in the amount of $2,095,517.93, plus prejudgment interest in the amount of $198,679.79, for a total of $2,294,197.72. The District Court also imposed a civil penalty against Smith in the amount of $120,000.

Arguing that Smith is ineligible to be a Chapter 13 debtor because his noncontingent, liquidated, unsecured debts on the Petition Date exceeded the $307,675 limitation imposed by § 109(e), the SEC seeks dismissal or conversion of this case. The SEC also asserts that Smith acted in bad faith by failing to list the amount of its claim in his schedules. Smith maintains that he is eligible for Chapter 13 relief, asserting that, as of the Petition Date, the SEC's claim remained both contingent and unliquidated. Smith also argues that, because the amount of the SEC's claim was not readily ascertainable on the Petition Date, he did not act in bad faith by listing its amount as "unknown."

Although the terms "noncontingent" and "unliquidated" are not defined in the Bankruptcy Code, case law from the Sixth Circuit and elsewhere establishes that a debt is noncontingent if all events giving rise to liability occurred prior to the filing of a debtor's bankruptcy petition. A debt is deemed liquidated if, on the date of filing, its amount is readily determinable by simple mathematical calculation; it is deemed unliquidated if a determination of

---

1. Because the Debtor's bankruptcy case was filed before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), generally effective October 17, 2005, all references to the Bankruptcy Code in this opinion are to the pre-BAPCPA version. (11 U.S.C. §§ 101–1330 (2000)). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 1501(b)(1), 119 Stat. 23, 216 (stating that, unless otherwise provided, the amendments do not apply to cases commenced under title 11 before the effective date of BAPCPA).

2. *See SEC v. Smith,* Case No. C2–CV–04–739 (S.D. Ohio filed Aug. 11, 2004).

the debt amount depends upon the future exercise of discretion by a court or finder of fact. As explained below, because the District Court made a prepetition liability determination against Smith—by entering summary judgment in favor of the SEC on its securities fraud claims—his debt to the SEC was noncontingent on the Petition Date. However, as of the Petition Date, the District Court had deferred a ruling on the remedies to be imposed against Smith and his co-defendants—and had scheduled a four-day trial on the issue of remedies. Because resolution of the remedies issues would have required the District Court's exercise of judgment and discretion—rather than a mathematical calculation—the amount of the SEC's claim was not readily determinable and, thus, it remained unliquidated on the Petition Date. Excluding the SEC's unliquidated claim, Smith's liquidated, unsecured debts did not exceed the debt limitation imposed by § 109(e) on the Petition Date. The Debtor is accordingly eligible for Chapter 13 relief.

## I. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## II. Procedural Background

### A. The Chapter 13 Case

Smith filed his schedules, his Statement of Financial Affairs, and a proposed Chapter 13 plan ("Plan") (Doc. 10) on the Petition Date. On his Schedule F (Creditors Holding Unsecured Nonpriority Claims), Smith listed the SEC as a general, unsecured creditor. The amount of the SEC's claim, which was scheduled as contingent and unliquidated, was listed as "unknown." The remaining debts listed on Schedule F, none of which were scheduled as contingent, unliquidated or disputed, totaled $258,184.13.

On December 20, 2005, Frank M. Pees, the standing Chapter 13 Trustee, filed an objection to confirmation of the Plan (Doc. 16), asserting that (1) the Plan did not comply with 11 U.S.C. § 1325(a)(1) because the Debtor had failed to file a complete list of creditors, Statement of Financial Affairs, and schedules as required by 11 U.S.C. § 521, (2) the Plan failed to meet the "best-interest-of-creditors test," which is set forth in § 1325(a)(4) of the Code, because the return to creditors under the Plan was less than they would receive in a Chapter 7 liquidation, and (3) the Plan was not feasible, thus violating 11 U.S.C. § 1325(a)(6). Because the Plan was not in a posture for confirmation prior to the scheduled January 10, 2006 hearing date, an order resetting the confirmation hearing for February 14, 2006 at 2:00 p.m. was entered by the Court (Doc. 18). Smith then filed an amended Chapter 13 plan on February 13, 2006 ("Amended Plan") (Doc. 21).

On February 13, 2006—approximately four months after the Petition Date—the SEC filed its motion to dismiss or convert the Debtor's case ("Dismissal Motion") (Doc. 23 and Doc. 24). The SEC also filed a motion requesting that the Court establish an expedited briefing schedule and set an expedited hearing on the Dismissal Motion (Doc. 25). The Court denied that request by order entered on February 23, 2006 (Doc. 28) and set the Dismissal Motion for hearing on March 21, 2006—the same date that the Court was scheduled to consider confirmation of the Amended Plan. Smith filed his response to the Dismissal Motion ("Response") on March 6, 2006 (Doc. 32), and the SEC filed a reply brief on March 17, 2006 ("SEC Reply Br.") (Doc. 33).

On March 3, 2006, the Trustee filed an objection to confirmation of the Amended Plan (Doc. 31). In his objection, the Trus-

tee—in addition to opposing confirmation of the Amended Plan on other grounds—joined the SEC in challenging Smith's eligibility for Chapter 13 relief. The Trustee's eligibility argument was presumably based on the SEC's filing of a proof of claim on February 9, 2006 (Claim No. 3), in the amount of $2,414,197.72. The filing of the SEC's proof of claim also created another bar to confirmation—if the SEC's claim were allowed in its full amount, Smith would be unable to complete payments under the Amended Plan within the 60–month period prescribed by 11 U.S.C. § 1322(d).

The Debtor filed a second amended plan ("Second Amended Plan") on March 21, 2006 (Doc. 34). The Second Amended Plan calls for graduated payments over a 57–month period and provides for payment of a 1.5% dividend to holders of general, unsecured claims. The hearing on confirmation of the Second Amended Plan was continued until May 16, 2006 by agreement of the Debtor and the Trustee. The hearing on the Dismissal Motion also was continued to that date. Yet another objection to the Second Amended Plan was filed by the Trustee on April 7, 2006 (Doc. 40). The Trustee's objection to the Second Amended Plan again raised the issue of Smith's eligibility for Chapter 13 relief under § 109(e), noted that the length of the Second Amended Plan exceeded § 1322(d)'s 60–month time limitation, and asserted that the Second Amended Plan was not feasible.

The Court conducted a hearing on the Dismissal Motion on May 16, 2006. Following oral arguments, counsel for the Debtor sought leave to file a supplemental brief on the issue of Smith's eligibility for Chapter 13 relief. The Debtor filed his Brief in Support of His Oral Argument and in Opposition to the SEC's Reply Memorandum on June 15, 2006 ("Debtor's Final Br.") (Doc. 49). On July 21, 2006, the SEC filed its Brief in Response to Debtor's Post Oral–Argument Brief Concerning the SEC's Motion to Dismiss or Convert Debtor's Bankruptcy Petition ("SEC's Final Br.") (Doc. 58). The confirmation hearing was continued pending the Court's determination of whether Smith is eligible to be a Chapter 13 debtor.

### B. The SEC Civil Enforcement Action

The SEC commenced its civil enforcement action in District Court on August 11, 2004, seeking relief from Smith and certain entities under his control—Continental Midwest Financial Inc. ("Continental"); Scioto National Inc. ("Scioto"); Bancshareholders of America, Inc. ("BSA"); and Bancshare Investors Brokerage, Inc. ("BSIB") (collectively, "Corporate Defendants"). In the District Court action, the SEC alleged violations of federal securities laws in connection with the private offerings of Scioto and Continental stock. Specifically, the SEC alleged violations of § 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); § 10(b) of the Securities and Exchange Act ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b(5) thereunder, 17 C.F.R. § 240.10b–5; § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and § 20(e) of the Exchange Act, 15 U.S.C. § 78t(e). According to the SEC's complaint, the Continental and Scioto stock offerings—and the fraudulent conduct by Smith that gave rise to the alleged violations of federal securities law—occurred sometime between early 2002 and July 2004. The SEC's complaint requested injunctive and equitable relief, including the disgorgement of ill-gotten gains generated from the two offerings in an amount exceeding $2 million. Smith and the other defendants filed a joint answer on September 10, 2004 (Dist. Ct.Doc. 16).

The District Court entered a Notice of Final Pretrial and Trial on December 13,

2004 ("Pretrial Notice") (Dist.Ct.Doc. 41). The Pretrial Notice scheduled a final pretrial on October 5, 2005 and a trial on December 5, 2005. The Pretrial Notice also required the parties to submit a joint final pretrial order for the District Court's consideration.

The SEC filed a motion for summary judgment on May 13, 2005 (Dist Ct.Doc. 48), and a response was filed by Smith and the other defendants on June 13, 2005 (Dist.Ct.Doc. 64). During the intervening time period—on June 3, 2005—the SEC filed a second amended complaint (Dist.Ct. Doc. 58). The defendants filed an answer to the second amended complaint on September 22, 2005 (Dist.Ct.Doc. 79). On September 27, 2005—less than three weeks before Smith filed his bankruptcy petition—the District Court entered an order granting in part, and denying in part, the SEC's motion for summary judgment ("Summary Judgment Order") (Dist.Ct. Doc. 81).

The SEC bases its challenge to the Debtor's eligibility for Chapter 13 relief on certain filings by the parties and rulings made by the court in the District Court action. Specifically, the SEC focuses on the Summary Judgment Order, the proposed and final joint pretrial orders filed by the parties after the Summary Judgment Order was entered, and the stipulation and final judgment entry that terminated the District Court litigation.

### 1. The Summary Judgment Order

The Summary Judgment Order recites that Smith operated several businesses through which investors purchased small, community bank stocks. Two of these companies—Continental and Scioto—conducted private offerings of their common stock, and in connection with each offering, Smith prepared private offering memoranda. *See* Summary Judgment Order at 2–3. Continental conducted its offering between

July 2002 and September 2004. According to the Continental private offering memorandum ("Continental POM"), the offering was to raise up to $2.27 million for investment in small Midwestern banks. The Continental POM represented that 80% of the offering proceeds would be invested in small-bank stocks. The Continental offering ultimately raised $1,272,665 from 49 investors. *Id.* The District Court found that only 9% of the Continental offering proceeds actually were used to purchase small-bank stocks. *Id.* at 4. Smith used the remaining proceeds to fund personal obligations, including payment of credit card charges for men's clothing, nutritional supplements and a dating/escort service, as well as expenses of his other businesses. *Id.*

Beginning in January 2004, Scioto conducted its private offering. *Id.* The Scioto private offering memorandum ("Scioto POM") stated that the offering would raise up to $1,008,000. According to the Scioto POM, Scioto was to use 70% of the proceeds raised from the offering for investment in small-bank stocks. *Id.* at 5. The Scioto offering actually raised $822,852 from 29 investors. Smith used only 21% of the offering proceeds for investment purposes. He spent $503,208 of Scioto investor funds on the expenses of his other businesses and $86,092 for his personal use, including $41,499 for his salary. *Id.*

The District Court granted summary judgment in favor of the SEC on three of its claims. Judgment was granted in favor of the SEC on its § 17(a)(1), § 10b, and Rule 10b–5 claims based on the District Court's finding that the "Defendants recklessly made material misstatements or omissions about how the investors' funds would be used in connection with the purchase or sale of securities." *Id.* at 15. Having concluded that Smith and his codefendants acted recklessly, the District Court found also that they "necessarily

acted negligently[ ]" and, thus, granted summary judgment on the SEC's § 17(a)(2) and (a)(3) claims. *Id.* at 17. And based on its determination that Smith was "liable as a control person [of both Continental and Scioto]," *id.* at 19, the District Court granted summary judgment in favor of the SEC on its claim under § 20(a) of the Exchange Act. *Id.* at 20. Finally, concluding that genuine issues of material fact existed, the District Court denied the motion for summary judgment on the SEC's claim against Smith for aiding and abetting Continental and Scioto's violation of § 20(e) of the Exchange Act and Rule 10b–5. *Id.*

The District Court reserved a ruling on the remedies to be imposed against Smith, Continental and Scioto, stating that:

> [t]he Court will not rule on the SEC's requested remedies at this time, but will instead conduct a hearing on the requested remedies at a future date after the trial concludes. To facilitate that hearing, the final pre-trial conference scheduled for October 5, 2005 at noon in chambers will also be a status conference. At that conference, the Court will discuss trial issues and will establish a briefing schedule on the issue of relief and remedies. The preliminary injunction will remain in full force and effect until after the trial is completed and the Court has issued its ruling on the requested relief and remedies.

*Id.* at 21.

### 2. The Proposed Pretrial Order

On September 30, 2005—several days after the Summary Judgment Order was entered—the parties jointly submitted a proposed pretrial order ("Proposed Pretrial Order") to the District Court (Dist.Ct. Doc. 83). In the Proposed Pretrial Order, the parties summarized the factual background of the case, listed the elements of each claim asserted in the complaint, and detailed the findings made by the District Court in the Summary Judgment Order. *See* Proposed Pretrial Order at 5–9. In the section of the Proposed Pretrial Order entitled "Plaintiff SEC's claims," the SEC set forth the various remedies it asked the District Court to impose against Smith, Continental, Scioto and the "Relief Defendants"—BSA and BSIB. *See id.* at 9–14. The Proposed Pretrial Order states that "[f]or the charged violations, the SEC seeks permanent injunctions against Smith, Continental and Scioto, disgorgement of all ill-gotten gains from all Defendants and Relief Defendants (plus prejudgment interest thereon), and civil penalties against Smith." *Id.* at 9. As to the remedy of disgorgement, the Proposed Pretrial Order states:

- "The SEC also seeks orders requiring disgorgement of the entire amount of profits that were illicitly received by all Defendants and Relief Defendants." *Id.* at 10.

- " 'Although the SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment,' a defendant may come forward with evidence that the disgorgement figure was not a reasonable approximation." *Id.* (quoting *SEC v. First City Fin. Corp., Ltd.,* 890 F.2d 1215, 1231 (D.C.Cir.1989)).

- "The SEC seeks an order requiring primary liability Defendants Continental and Scioto to disgorge the full amount raised by each through the Continental and Scioto offerings, plus prejudgment interest.... The SEC seeks an order finding Smith jointly and severally liable as a control person for the entire amounts of disgorgements, plus prejudgment interest, awarded against Continental and Scioto." *Id.* at 11.

- "In the event that the Court does not find that Smith was a control person,

the SEC would seek disgorgement against Smith of all amounts that he received or that were spent for his benefit from the proceeds of the Continental and Scioto Offerings." *Id.*

Smith, Continental and Scioto briefly summarized their position with respect to remedies in the section of the Proposed Pretrial Order entitled "Defendants' claims." They stated that the investors involved in the offerings were "experienced, sophisticated investors." *Id.* at 14. Smith and Continental also asserted "that the [offering] proceeds were to be used for Continental's operations and to develop the business as set forth in the business plan, and that the portfolio of bank stocks was to be purchased later after the exercise of warrants." *Id.* at 15. According to Smith and Scioto, the information conveyed orally and through written materials to the investors was "that the business of Scioto was to engage in financial planning, that Scioto was to be an affiliated company of Continental that would later be consolidated with Continental, that investors were informed that Scioto would use the proceeds to sustain its operations, and that investors were never told that the purpose of Scioto was to invest in bank stocks." *Id.*

In the Proposed Pretrial Order, the parties agreed that there were no remaining contested issues of fact or law as to the SEC claims under § 17(a) of the Securities Act and § 10(b) of the Exchange Act against Smith, Continental and Scioto, or with respect to the SEC's claim that Smith was liable as a control person under § 20(a) of the Exchange Act. With respect to the SEC's claim against Smith under § 20(e) of the Exchange Act for aiding and abetting Continental and Scioto's violations of the Act, the parties agreed that only two contested issues of fact remained to be tried. *Id.* at 20. But, insofar as remedies were concerned, the Proposed Pretrial Order recited numerous contested issues of fact remaining to be adjudicated at trial, including the following:

- "d. Whether the Court should impose a civil penalty against Smith and, if so, in what amount." *Id.* at 21.
- "e. Whether the Court should order that Smith disgorge his ill-gotten gains and, if so, in what amount." *Id.*
- "f. Whether the Court should order that Continental disgorge its ill-gotten gains and, if so, in what amount." *Id.*
- "g. Whether the Court should order that Scioto disgorge its ill-gotten gains and, if so, in what amount." *Id.*
- "i. Whether the Court should order Defendants and Relief Defendants to pay prejudgment interest on their disgorgement amounts, and if so, in what amounts." *Id.*

### 3. The Final Pretrial Order

On December 2, 2005—nearly two months after the Petition Date—the District Court entered an amended version of the Proposed Pretrial Order ("Final Pretrial Order") (Dist.Ct.Doc. 98). After jointly submitting the Proposed Pretrial Order, the SEC opted not to go forward at trial with its aiding and abetting claim against Smith. Thus, one notable difference between the Proposed and Final Pretrial Orders is that the "Current Procedural Posture" section of the Final Pretrial Order states that "the only issues remaining for trial are: 1. whether BSA and BSIB should be held liable as relief defendants; and 2. what remedies should be ordered against Defendants and Relief Defendants." Final Pretrial Order at 3. As to the remedies sought by the SEC, the Final Pretrial Order repeated all of the contested issues of fact that were enumerated in the Proposed Pretrial Order, but listed two additional remedies issues to be determined by the District Court at trial:

• "g. Whether the Court should order that Smith be held jointly and severally liable for the ill-gotten gains of Continental and Scioto as a 'control person' pursuant to 15 U.S.C. § 20(a)." *Id.* at 21.

• "h. Whether, in the case that the Court declines to hold Smith jointly and severally liable for the disgorgement of the ill-gotten gains of Continental and Scioto, the Court should order that Smith disgorge his personal ill-gotten gains and, if so, in what amount." *Id.*

In the Final Pretrial Order, the SEC identified a total of 11 witnesses whom it would call at trial and reserved the right to call 7 others. Smith and the Corporate Defendants identified a total of 19 witnesses whom they would call at trial. The Final Pretrial Order listed a total of 123 exhibits that the parties intended to introduce at the trial. The parties estimated that the trial of the remedies issues would require a total of four days to complete. *See id.* at 4 ("The estimated length of the trial is 4 days. The SEC estimates that it will take 2 days for it to put on its case-in-chief. Defendants estimate that it will take 2 days for them to put on their defense.").

### 4. The Stipulation and Final Judgment

On December 6, 2005, the SEC, Smith and the Corporate Defendants filed a Stipulation of the Parties ("Stipulation") (Dist. Ct.Doc. 100). The parties first noted in the Stipulation that "[t]he Court scheduled trial to commence on December 5, 2005 to determine what remedies, if any, should be imposed against each of the defendants based on [the Summary Judgment Order]." Stipulation at 1. The Stipulation goes on to state, however, that the need for the scheduled trial had been obviated by the defendants' agreement to disgorge their ill-gotten gains from the Continental and Scioto offerings and also to pay prejudgment interest on the disgorgement amount. *Id.* Under the Stipulation, Smith agreed that he would be jointly and severally liable with Continental and Scioto for a disgorgement obligation of $2,095,517.93, plus prejudgment interest in the amount of $198,679.79, for a total of $2,294,197.72. *Id.* at 2. Contemporaneously, the District Court entered its final judgment as to all defendants ("Final Judgment") (Dist.Ct. Doc. 101). In the Final Judgment, the District Court ordered, among other things, that "Smith's total joint and several disgorgement obligation is in the amount of $2,095,517.93, together with prejudgment interest thereon in the amount of $198,679.97, for a total of $2,294,197.72." Final Judgment at 4. In addition, Smith was ordered to pay a civil penalty in the amount of $120,000. *Id.* at 6.

The Stipulation preserved the defendants' right to appeal the Summary Judgment Order, and the defendants filed their notice of appeal on December 16, 2005. In an unreported, per curiam decision issued on December 15, 2006, the Sixth Circuit affirmed the Summary Judgment Order.[3]

---

**3.** In its briefing and at oral argument on the Dismissal Motion, the SEC argues that Smith's consent to the Stipulation establishes that he knew that a judgment in favor of the SEC in excess of $2 million was a foregone conclusion. According to the SEC, the Debtor simply delayed the inevitable by waiting to agree to the Stipulation until after he had filed his bankruptcy petition, thus preserving his ability to argue that the SEC's claim re-

mained contingent and unliquidated on the Petition Date. The Debtor takes issue with the SEC's characterization of his motives, stating that he could not afford to pay his attorneys both to appeal the Summary Judgment Order and go forward with the four-day trial on the remedies issues. Smith points out that the Stipulation would have been rendered null and void had he and the Corporate Defen-

## III. Legal Analysis
### A. Eligibility for Chapter 13 Relief

As stated above, a debtor is eligible for relief under Chapter 13 only if he/she owes noncontingent, liquidated debts aggregating less than the amounts specified in 11 U.S.C. § 109(e). Courts are divided on the question of who bears the burden of proof in an eligibility dispute. This Court has held that the party challenging eligibility has the initial burden of going forward with evidence that the debtor is not eligible. *See In re Pike,* 258 B.R. 876, 882 (Bankr.S.D.Ohio 2001) (addressing § 109(g) eligibility issue). *Accord In re Horne,* 277 B.R. 320, 322 (Bankr.E.D.Tex. 2002) ("Movant bears the burden of proof to demonstrate to the Court, by a preponderance of the evidence, that the Debtor does not comply with the § 109 debt limit."); *In re Baird,* 228 B.R. 324, 330 (Bankr.M.D.Fla.1999) (same). *But see Nat'l Sch. Bus, Inc. v. Carignan (In re Carignan),* 190 B.R. 739, 741 (N.D.N.Y. 1996) ("It is well-settled that the *debtor* has the burden of proving entitlement to relief under Chapter 13. . . ."); *In re Odette,* 347 B.R. 60, 62 (Bankr.E.D.Mich. 2006) ("Debtors bear the burden of proof to demonstrate chapter 13 eligibility.").

The Court may dismiss or convert the case to another chapter of the Bankruptcy Code if the debtor fails to meet § 109(e)'s eligibility requirements. *See In re White,* 216 B.R. 232, 234 (Bankr.S.D.Ohio 1997). Here, the SEC argues that on the Petition Date it held a noncontingent, liquidated, unsecured claim exceeding $2.4 million. The SEC maintains, therefore, that because Smith's total unsecured debt at filing far exceeded the $307,675 limitation established by § 109(e), he is not eligible to be a Chapter 13 debtor.

 The starting point in the Court's § 109(e) eligibility analysis is the Debtor's bankruptcy petition and schedules. "[A] court should rely primarily upon the debtor's schedules checking only to see if the schedules were made in good faith on the theory that section 109(e) considers debts as they exist at the time of filing, not after a hearing." *Comprehensive Accounting Corp. v. Pearson (In re Pearson),* 773 F.2d 751, 756 (6th Cir.1985); *see also In re Hughes,* 98 B.R. 784, 788 (Bankr.S.D.Ohio 1989) (same). Courts are not to consider postpetition events in the eligibility analysis. *See Pearson,* 773 F.2d at 756; *In re Smith,* 325 B.R. 498, 502 (Bankr.D.N.H. 2005) ("Eligibility for chapter 13 is not based upon postpetition events such as allowed claims, filed claims, or treatment of claims in a confirmed chapter 13 plan."). There is, however, an exception to this rule: "When it appears a debtor did not exercise reasonable diligence or good faith in completing and filing the schedules, the Court may look to other evidence, including postpetition events to determine eligibility." *Smith,* 325 B.R. at 502.

 The schedules—even if filed in good faith—are not dispositive of a debtor's eligibility for Chapter 13 relief. Thus, a bankruptcy court is not bound by how the debtor schedules a creditor's claim. *See In re Stern,* 266 B.R. 322, 326 (Bankr. D.Md.2001) ("A debtor's designation of debt as 'unliquidated' does not settle the question."); *In re McGovern,* 122 B.R. 712, 714 (Bankr.N.D.Ind.1989) ("Congress did not intend that debtors would be given exclusive control over the accessibility to Chapter 13 or be permitted to circumvent its debt ceilings by the artful manipulation of the information contained in the bankruptcy filings. . . . [J]ust because a creditor has been scheduled in one fashion or another does not necessarily make it so."). Nor must a bankruptcy court accept a creditor's characterization of its claim.

dants prevailed on appeal. *See* Stipulation ¶¶ 5–6.

Rather, "the court is required to look beyond the information given and make an independent determination." *Id.* The Court must therefore independently determine whether the SEC's claim was noncontingent and liquidated as of the Petition Date.[4]

### B. Was Smith's Debt to the SEC Noncontingent on the Petition Date?

■ As previously stated, the Bankruptcy Code does not provide statutory guideposts for distinguishing contingent from noncontingent debts. While the term "noncontingent debt" is not statutorily defined, case law uniformly holds that "a debt is contingent if it does not become an obligation until the occurrence of a future event, but is noncontingent when all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy." *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997); *In re Krupka*, 317 B.R. 432, 436 (Bankr.D.Colo.2004). Thus, the unsecured debt held by the SEC will be found to be noncontingent only if the Court concludes that all events giving rise to Smith's liability to the SEC occurred before he sought bankruptcy relief. *See Redburn*, 193 B.R. at 259. *See also De Jounghe v. Mender (In re De' Jounghe)*, 334 B.R. 760, 769 (1st Cir. BAP 2005) ("[I]f all events giving rise to liability occurred prior to the filing of the bankruptcy petition, the debt is not

contingent."); *McGovern*, 122 B.R. at 715–16 ("[C]ontingency involves the nature or origin of liability.... The distinction between contingent and noncontingent debts turns upon whether or not there is a presently existing duty, which should be fulfilled, as opposed to a duty which may arise sometime in the future.").

■ Smith maintains that his debt to the SEC was contingent as of the Petition Date, pointing out that, while he had been found liable on the securities fraud claims before he filed his Chapter 13 case, the District Court had not entered a prepetition judgment imposing the remedies sought by the SEC—disgorgement, a civil penalty and prejudgment interest. Because he had not agreed to a specific disgorgement amount, and because the District Court had yet to enter a monetary judgment against him (requiring disgorgement of a sum certain, payment of prejudgment interest, and/or imposition of a civil penalty), Smith asserts that he had no legal duty to pay the SEC on the Petition Date. The Debtor therefore claims that his debt to the SEC remained contingent at the time he sought bankruptcy protection. *See* Response at 3 ("[T]he SEC's claim was contingent because the District Court had not yet entered an order fixing and awarding the SEC a right to payment of a monetary remedy.").

The SEC responds by pointing out that its claim arose from fraudulent acts by

4. The SEC argues that Smith's failure to schedule its claim as disputed "serv[es] as additional evidence that the Debtor did not seriously dispute the amount of the SEC's disgorgement claim...." SEC Final Br. at 4. Section 109(e) does not impose a requirement that a claim be undisputed in order to be counted in calculating a Chapter 13 debtor's total unsecured indebtedness. Although the "three concepts—contingent, liquidated, and disputed—are interrelated[,] [t]hey are not ... interdependent." *McGovern*, 122 B.R. at 714–15. Here, the fact that the Debtor failed

to dispute the SEC's claim has little or no bearing on the § 109(e) eligibility issues before the Court—whether the claim was noncontingent and liquidated as of the Petition Date. *See In re Redburn*, 193 B.R. 249, 257 (Bankr.W.D.Mich.1996) ("For purposes of determining eligibility under section 109(e), it is immaterial whether or not the debt is 'disputed.'"); *McGovern*, 122 B.R. at 717 ("[D]isputes, defenses, and counterclaims concerning a debt are not relevant to the question of eligibility for relief under Chapter 13.").

Smith committed well before the time he filed his Chapter 13 case. *See* Dismissal Motion at 5. According to the SEC, application of the accepted test for distinguishing contingent from noncontingent debts—whether "all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy[,]" *see Mazzeo*, 131 F.3d at 303—leads to the inescapable conclusion that its claim against Smith did not remain contingent on the Petition Date. The Court agrees.

█ The Debtor's suggestion that the SEC's claim necessarily remained contingent until such time as the District Court imposed a remedy against him is erroneous. As the bankruptcy court explained in *McGovern*, "contingency involves the nature or origin of *liability* . . . . [I]t relates to the time or the circumstances under which *liability* arises [and] . . . does not mean the same as judgment or remedy, but only a condition of being obligated to answer for a claim." *McGovern*, 122 B.R. at 715 (emphasis added) (internal quotation marks omitted). In this case, all of the events giving rise to Smith's liability to the SEC—namely, his misconduct in connection with the Continental and Scioto offerings—occurred well before the Petition Date. More importantly, Smith's liability to the SEC on its securities fraud claims had actually been adjudicated by the District Court in the Summary Judgment Order, which was entered more than two weeks before the Petition Date. As previously stated, in the Summary Judgment Order the District Court found Smith—along with Continental and Scioto—liable on the SEC's claims under § 17(a) of the Securities Act and § 10(b) of the Exchange Act (and Rule 10b–5) and as a control person under § 20(a) of the Exchange Act. As *McGovern* instructs, a bankruptcy court's contingency analysis must focus not on whether a judgment or remedy has been imposed, but rather on the "time or circumstances under which

liability arises." *Id.* Here, because Smith's liability to the SEC had been established pre-bankruptcy by the entry of the Summary Judgment Order, the SEC's claim was noncontingent on the Petition Date.

## C. Was Smith's Debt to the SEC Liquidated on the Petition Date?

█ The Court must next determine whether the SEC's claim was liquidated as of the Petition Date. As previously noted, the term "liquidated debt"—like the term "noncontingent debt"—is not defined in the Bankruptcy Code. Addressing a challenge to the debtor's eligibility for Chapter 13 relief, the Sixth Circuit in *Pearson* discussed the meaning of the term "liquidated debt" contained in § 109(e), stating:

> The concept of liquidation has been variously expressed. The common thread throughout the cases, however, has been ready determination and precision in computation of the amount due . . . . [A] liquidated debt [is] one that can be determined by mathematical computation. Some cases have stated the test as whether the amount due is capable of ascertainment by reference to an agreement or by simple computation.

773 F.2d at 754 (alterations in original) (internal quotation marks omitted). Since *Pearson*, courts applying § 109(e)'s eligibility standard have uniformly held that ready determinability is the touchstone for distinguishing between liquidated and unliquidated debts. *See, e.g., Mazzeo*, 131 F.3d at 300 (" 'Liquidated' denotes the ability to readily and precisely compute the amount due . . . ."); *United States v. Verdunn*, 89 F.3d 799, 802–03 (11th Cir. 1996) (holding that tax debt was liquidated for purposes of § 109(e) because the amounts due the Internal Revenue Service were "easily ascertainable"); *In re Knight*, 55 F.3d 231, 235 (7th Cir.1995) ("If the amount of a claim has been ascertained or

can readily be calculated, it is liquidated...." (internal quotation marks omitted)); *Fostvedt v. Dow (In re Dow)*, 823 F.2d 305, 306 (9th Cir.1987) ("[T]he question whether a debt is liquidated turns on whether it is subject to ready determination and precision in computation of the amount due." (internal quotation marks omitted)); De *Jounghe*, 334 B.R. at 769 ("[C]ourts have generally held that a debt is 'liquidated' ... where the claim is determinable by reference to an agreement or by simple computation." (alteration in original)); *McGovern*, 122 B.R. at 715 ("A claim is often characterized as liquidated if the amount due can be readily ascertained either by reference to an agreement or through simple mathematics."); *Hughes*, 98 B.R. at 788 ("[C]laims are liquidated if the court is able to make a sufficiently precise determination of the amount due for the claim." (internal quotation marks omitted)).

 Courts applying the readily-determinable test generally hold that a debt is unliquidated if judgment, discretion or opinion—as distinguished from mathematical computation—is required to determine the amount of the claim. *See, e.g., Horne*, 277 B.R. at 324 ("The element of 'discretion' [is] a distinguishing factor to discern whether a debt is liquidated...."); *In re Newman*, 259 B.R. 914, 918 (Bankr. M.D.Fla.2001) ("Mathematical computation is the basis for a liquidated debt, where opinion, discretion, and exercise of judgment are not relevant for computation of the amount of the debt."); *In re Vaughn*, 276 B.R. 323, 326 (Bankr.D.N.H.2002) ("[I]f the debt amount is dependent upon a future exercise of discretion by a court ... the debt is unliquidated."). As the bankruptcy court in *McGovern* put it, "a claim is unliquidated when the finder of fact must rely upon its judgment to establish an appropriate amount to compensate for past and future injury. It is liquidated when judgment or discretion is not re-

quired." 122 B.R. at 715 (citation omitted). The *McGovern* court added that

> [t]he need to use judgment in determining the amount of liability must be distinguished from the judgment which must necessarily be used to determine the existence of liability. A court or a jury will always be required to exercise its judgment in determining the fact of liability. The assessment of damages, however, does not always require the court or the jury to do so.

*Id.* at 715 n. 1.

Decisions rendered by courts applying the foregoing principles arise from a wide range of fact patterns. At one end of the spectrum lies the classic liquidated debt— a contract claim that can be calculated from the face of the writing. *See, e.g., Fostvedt*, 823 F.2d at 306 (finding debt to be liquidated because "the amount due on the two [promissory] notes could be readily determined at the time of filing"); *Commonwealth Bank v. Pambianco (In re Pambianco)*, 206 B.R. 351, 352 (Bankr. M.D.Pa.1996) (holding "that the amount of debt at issue can easily be determined [from the face of the promissory note signed by the debtors] and is, therefore, liquidated"); *In re Pulliam*, 90 B.R. 241, 246 (Bankr.N.D.Tex.1988) ("A guaranty is a type of contract that is inherently liquidated when it is used to guarantee a promissory note because the amount owed can be determined from the promissory note and supporting documents."). The classic unliquidated debt—a claim based on tort or quantum meruit—lies at the other end of the spectrum. *See, e.g., In re Arcella–Coffman*, 318 B.R. 463, 473 (Bankr. N.D.Ind.2004) ("Because the determination of both liability and damages ordinarily requires the exercise of judgment by the factfinder, claims based on tort and on quantum meruit are generally unliquidated, unless they have been resolved by a

784

judicial decree or otherwise."); *In re Belt,* 106 B.R. 553, 558–59 (Bankr.N.D.Ind.1989) (holding that creditors' claim for injuries they sustained as a result of debtor's drunk driving was an unliquidated debt and noting that tort claims "are unliquidated until resolved by judgment decree or otherwise because the claimant's damages are not fixed"); *Pulliam,* 90 B.R. at 246 (same).

Not surprisingly, most of the reported § 109(e) eligibility decisions in which courts have applied the readily-determinable standard to distinguish liquidated from unliquidated claims arise from fact patterns that fall somewhere in the middle of the range. Tax claims, for example, have been held to be liquidated debts because their amount is readily determinable. *See, e.g., Mazzeo,* 131 F.3d at 305 (concluding that debtor's obligation arising from failure by corporation he controlled to pay state withholding taxes "can readily be ascertained from statutory provisions and from the tax returns filed by [the corporation]"); *Verdunn,* 89 F.3d at 803 (holding that Internal Revenue Service's claim was liquidated because amount was calculable using "fixed legal standards set forth in the tax code" and the "tax liability was evident from ... the statutory notice of deficiency"). Debts based on a debtor's misappropriation of funds comprise a second category of claims whose amount is readily determinable. *See, e.g., McGovern,* 122 B.R. at 717 (claim arising from debtor's misappropriation held to be liquidated because the court "need only add up the amount of money involved in each [wrongful transaction] to determine the amount of the claim[,] ... which will require only mathematics not the exercise of judgment"); *Krupka,* 317 B.R. at 436–38 (Bankr.D.Colo.2004) (determining that claim against debtor for misappropriation of investor funds was liquidated because total amount of misappropriated funds was known and Colorado statute did not confer

on courts the discretion not to award treble damages once a defendant's theft had been established). A debt based on the right of subrogation has also been deemed liquidated because the claim amount is readily determinable. *See, e.g., In re Clark,* 91 B.R. 570, 574 (Bankr.D.Colo. 1988) (subrogation claim asserted by insurance carrier issuing employee dishonesty policy held to be liquidated because the amount of the claim, which was based on the amount actually paid under the insurance policy, was "clear, precise and not subject to bona fide dispute"); *In re Furey,* 31 B.R. 495, 497 (Bankr.E.D.Pa.1983) (finding that issuer of bond insuring against fraudulent or dishonest act by employees held a liquidated claim because the debtor had admitted misappropriating funds from his employer and subrogee had indisputably paid a sum certain to the debtor's employer). Finally, there are statutory claims whose amounts are determined by a mathematical calculation rather than through the exercise of judgment or discretion by a court or fact finder. *See, e.g., Knight,* 55 F.3d at 235 (holding that State of Indiana's claim against the debtor was "easily calculated by multiplying ... the number of traffic violations [the debtor failed to report] by [the] $100.00 [per-violation statutory fee]"); *In re Doyle,* 340 B.R. 381, 385–86 (Bankr. D.Or.2006) (portion of claim attributable to "New Transactions" penalties was readily determinable because Oregon campaign finance statute provided a specific penalty amount for each unreported campaign contribution or expenditure); *Smith,* 325 B.R. at 504–05 (holding that local water and sewer district's environmental clean-up claim was liquidated because, under governing New Hampshire statute, claim is "based upon actual costs ... [that] can be readily determined with precision through simple arithmetic computation").

Decisions in which courts have applied the readily-determinable test and concluded that the debt in question is unliquidated generally have involved either tort claims, *see, e.g., Belt,* 106 B.R. at 558–59 (holding that drunken driving tort claim against debtor was unliquidated) or statutory claims that require a court or finder of fact to exercise discretion—rather than simply make a mechanical calculation—in order to assess damages, *see, e.g., Doyle,* 340 B.R. at 385 (portion of claim attributable to "Personal Use" penalties under Oregon campaign finance statute was not readily calculable because determination of what constituted an impermissible personal expenditure was based on the totality of the circumstances); *Smith,* 325 B.R. at 505–06 (amount of claim asserted by the State of New Hampshire arising from debtors' improper disposal of hazardous waste was not readily ascertainable because, under the controlling state statute, a court would be required to exercise discretion to determine the appropriate penalty); *In re Mandarino,* 312 B.R. 214, 219 (Bankr.E.D.N.Y. 2002) ("There is no 'simple computation' this Court can use to fix the amount of the claim .... [where,] [u]nder 47 U.S.C. § 605, the sanctions range from '$10,000 per unit' to as little as a total fine of $250 [for each pirated cable television descrambling device purchased by the debtor]."); *Horne,* 277 B.R. at 326 (holding that claim against debtor arising under Texas Deceptive Trade Practices Act was unliquidated because "[i]t [was] clear that th[ere] was no simple mathematical computation" the district court could employ to fix a damage amount and because "the evidence of application of judicial discretion is clear from the language of the [court's] [f]indings"); *Hughes,* 98 B.R. at 787–88 (concluding that claims asserted by the State of Ohio under both state and federal odometer rollback and disclosure laws and the Ohio Consumer Sales Practices Act were unliquidated because, as of the filing date, "there was

simply no method the court could have employed to ascertain with precision what amount the state court would later fix and award as damages").

In *Smith* and *Horne*—like the present case—the debtors' eligibility for Chapter 13 relief was challenged based on the filing of large statutory claims asserted by governmental creditors. The argument was made—by the governmental creditors and the Chapter 13 Trustee in *Smith,* and by the trustee only in *Horne*—that the amount of these claims was readily determinable, and thus they were liquidated, on the bankruptcy filing date. Although the statutory claims asserted in those cases were not based on the violation of federal securities laws, the analysis undertaken by the *Smith* and *Horne* courts of the determinability of the governmental creditors' claims is instructive here.

In *Smith,* the bankruptcy court was required to determine whether two claims for hazardous waste cleanup—one asserted by the Plymouth Village Water & Sewage District and the other by the State of New Hampshire—were liquidated for purposes of § 109(e). Before the debtors filed their Chapter 13 case, the New Hampshire Department of Environmental Services had issued an administrative order finding that the debtors had illegally disposed of hazardous waste from their dry cleaning business and were liable for costs associated with the clean-up. *Smith,* 325 B.R. at 504. Although they did not appeal the administrative order and undertook remedial action, the debtors scheduled the State and District claims as unliquidated, arguing that these claims should not be included in determining their eligibility for Chapter 13 relief. *Id.*

For purposes of litigating the eligibility challenge, the parties agreed to limit the District's claim amount to $156,562.28—the actual, prepetition clean-up costs incurred

by the District. *Id.* The debtors argued that the District's claim was unliquidated because its response to the containment and disposal of the hazardous waste was not reasonable and it had failed to mitigate its damages. *Id.* at 505. Rejecting the debtors' contention that the District's claim was "more like a tort claim which cannot be readily determined[,]" the *Smith* court reasoned that "[e]ven if the [d]ebtors have defenses that may decrease the amount of the District's claim based on reasonableness of expenditures or a failure to mitigate damages, it does not affect the character of the claim." *Id.* The court concluded that the District's claim was liquidated because it was based on actual clean-up costs incurred and, thus, the claim amount was determinable "with precision through simple arithmetic computation." *Id.*

The *Smith* court reached a contrary conclusion with respect to the State claim, which was "based entirely on civil penalties" imposed due to the debtors' illegal disposal of hazardous waste. *Id.* The civil penalties were assessed under a New Hampshire statute that punished illegal disposal of hazardous waste by requiring a civil forfeiture of up to $50,000 a day for each day of a continuing violation. *Id.* The State arrived at the amount of the civil penalty set forth in its proof of claim by using the facts and findings contained in a Department of Environmental Services administrative order and applying an "EPA Penalty Matrix." *Id.* The debtors asserted that the State's use of the penalty matrix demonstrated that the determination of its claim amount was a discretionary function. *Id.* at 506. That, along with the "subjective valuations regarding the degree of harm ... resulting from the [d]ebtors' actions[,]" established that the amount of the State's claim was not readily determinable and, hence, the claim was unliquidated. *Id.* The court agreed with the debtors that the State's "determination of the penalty

in the context of the penalty matrix ... [required] an exercise in discretion ... [and, its claim therefore was] not subject to ready determination and precision in computation of the amount due[,]" explaining:

> Proper use of the penalty matrix necessarily requires discretionary judgments regarding the seriousness and nature of the Debtors' actions to reach a final penalty amount. Thus, unlike a simple contract action, the Court could not independently determine the amount of the penalty obtained by the State simply by looking at the facts and applying them to the matrix. Simply because the amount of the penalty is estimated in good faith does not change the fact the actual amount of the penalty is dependent upon the exercise of discretion. Although the amount of the penalty is limited by the New Hampshire statute, there is a range of possible outcomes dependent on a discretionary determination of the seriousness of the violations then applied to the penalty matrix.

*Id.* The Smith court therefore held that the State's claim should not be counted in determining the debtors' eligibility for Chapter 13 relief. *Id.* at 507.

In *Horne*, the Chapter 13 Trustee challenged the debtor's eligibility for Chapter 13 relief. Asserting that the State of Texas held a liquidated, unsecured claim in the amount of $485,375, the Trustee sought dismissal of the debtor's Chapter 13 case on the ground that the total of his noncontingent, liquidated, unsecured debts exceeded the limitation imposed by § 109(e). *Horne*, 277 B.R. at 321. The claim in question arose from a postpetition, federal district court judgment obtained by the Texas Attorney General against American Blast Fax, Inc., and its 50% shareholders—one of whom was the debtor, Robert

Horne.[5] *Id.* Prior to the debtor's Chapter 13 filing, the district court had granted the State's motion for partial summary judgment, holding "that the corporate defendant had violated the Texas Consumer Practices Act [ ('TCPA') ] by sending unsolicited intrastate fax advertisements and that the corporation had violated the Texas Deceptive Trade Practices Act by misleading Texas consumers about the legality of its business." *Id.* at 325. The issues remaining for trial "were the amount of damages and the scope of injunctive relief, if any, for [the corporation's] violations and whether the individual defendants could be held personally liable for these violations." *Id.* at 323. The district court found the debtor personally liable for Blast Fax's violations of the TCPA and concluded that the statutory violations occurring during a five-week period in 2001 had been knowing and willful. *Id.* Concluding that the debtor, his co-shareholder and the corporation had violated the TCPA 937,500 times a month over a five-month period, the district court "calculated the damages at $459,375 based on a formula it devised." *Id.*

"According to the Standing Chapter 13 Trustee, the [district court's] ability to calculate the damages based upon a specific formula rendered the debt liquidated." *Id.* The debtor maintained that his debt to the State was unliquidated when he commenced his Chapter 13 case, arguing that the district court "need[ed] to use independent judgment . . . [and] discretion" to fix the amount of damages to be awarded to the State. *Id.* at 324.

The *Horne* court began its analysis by explaining that " 'if judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim, it is unliquidated.' " *Id.* at 325 (quoting *McGovern,* 122 B.R. at 717–18). The court then described the methodology employed by the district court to arrive at a damage amount:

Although the Trustee argues that the District Court in our case used a simple formula to calculate the damages, a complete reading of the District Court's reasons for judgment makes it clear that this was no simple matter. . . . [Although it had granted the State's motion for partial summary judgment,] . . . [t]he District Court had specifically reserved for trial the question of the amount of damages and the scope of injunctive relief. . . . [A] reading of the reasons for judgment makes it clear that this was no simple application of a mathematical formula. The Court had to determine the number of unsolicited faxes mailed; the percentage of those actually received and had to determine the degree of willfulness on the part of the individual defendants to determine the penalties applicable to them.

The Court then looked at the question of damages based on the application of the Texas Statute and determined that under one construction of the Statute, which provided for a $500.00 award for each violation, the penalty would be "inequitable and unreasonable." The Court then made a determination based on its analysis of the cost to the recipient of each unwanted fax page that an appropriate award in this case would be seven cents per violation. The Court also had to assess the question of willful and knowing violation of the Statute and found that for a portion of the time, the Defendant's conduct was willful and

---

**5.** Because the case filed by the State of Texas against Blast Fax and the debtor constituted an action to enforce the State's police or regulatory powers, it was not stayed by the filing of the debtor's Chapter 13 petition. *Horne,* 277 B.R. at 322 n. 1 (citing 11 U.S.C. § 362(b)(4)).

knowing and therefore, the damages for that period of time was trebled. The Court additionally made an award to the state of attorney fees based on its determination of the reasonable amount of the fees.

*Id.* at 325–26. The court added that "the evidence of application of judicial discretion is clear from the language of the [district court's] [f]indings." *Id.* at 326. Because "[s]imple mathematics alone did not supply the value of the State's claim[,]" the court concluded that "the [State's] claim was not liquidated or certain on the date of the filing of the petition, nor did it become so until the District Court's final judgment was rendered." *Id.*

As noted above, neither *Smith* nor *Horne* involved governmental claims arising from a debtor's violation of federal securities laws. Although not cited by the parties, the Court's independent research has revealed only one decision in which a bankruptcy court has been confronted with the issue of whether a securities fraud claim, which had not been reduced to judgment on the date of the debtor's bankruptcy filing, constitutes a liquidated claim for purposes of § 109(e)—an unreported, three-page order issued by Judge Hale in *In re Svoboda,* Case No. 04–82284, (Bankr. N.D.Tex. November 28, 2005) (Tex.Bankr. Ct.Doc. 87). There, the debtor, Richard A. Svoboda, had engaged in illegal insider trading and—prior to his bankruptcy filing—had pleaded guilty to 10 counts of securities fraud and seven counts of tender-offer fraud. Upon his release from prison, Svoboda filed a Chapter 13 petition. At the time the debtor sought bankruptcy protection, an SEC civil enforcement action was pending against him in the United States District Court for the Southern District of New York. The SEC had commenced the civil enforcement action—in which it alleged multiple violations of federal securities laws and sought disgorgement, prejudgment interest and penalties—some four years earlier. More than a year after the debtor filed his Chapter 13 case, the district court entered summary judgment against him, finding that Svoboda had committed violations of § 10b–5 of the Exchange Act and Rule 10b–5 thereunder, § 14(e) of the Exchange Act and Rule 14e–3 thereunder, and § 17(a) of the Securities Act. *See SEC v. Svoboda,* 409 F.Supp.2d 331, 339–49 (S.D.N.Y.2006). The district court ordered the debtor to disgorge more than $2 million and imposed prejudgment interest and civil penalties. *Id.* at 349.[6]

More than eight months before the district court entered its judgment, the SEC moved to dismiss Svoboda's Chapter 13 petition, arguing—as it has here—that because its claim was liquidated on the bankruptcy filing date, the debtor's total liquidated debts exceeded the limitation imposed by § 109(e). About one month before the judgment was entered against the debtor by the district court in the civil enforcement action, the bankruptcy court denied the SEC's request for dismissal, concluding that Svoboda's debt to the SEC remained unliquidated on the date he had filed his Chapter 13 petition. The bankruptcy court stated:

[I]f one can simply calculate the damages and ascertain them with certainty in a simple fashion, a debt is a liquidated debt, but if one needs to use independent judgment, then the debt is unliquidated.

The decisions in this area indicate that if judgment, discretion, or opinion is required to determine the amount of the

---

**6.** As in *Horne,* the government's action in *Svoboda* was not stayed by the debtor's Chapter 13 filing because it was a proceeding by a governmental unit to enforce its police or regulatory powers. *See* 11 U.S.C. § 362(b)(4).

claim, it is unliquidated. *See Horn[e]*, 277 B.R. at 718. The Court finds that the claim of the SEC has not been liquidated and is still subject to the discretion of the district court in the SEC's civil suit against the Debtor. The claim should therefore not be included in the § 109(e) analysis.

*Svoboda*, Case No. 04–82284 (Tex.Bankr. Ct.Doc. 87) at 2–3.[7] Although the Svoboda court did not provide an extensive explanation of its rationale, it apparently concluded that the remedies issues facing the district court in the civil enforcement action—whether to order disgorgement and, if so, in what amount, whether to impose prejudgment interest, and whether to impose civil penalties—all required the exercise of judgment and discretion.

■ Applying the principles discussed above to the undisputed facts of this case, the Court concludes that the amount of the SEC's claim against Smith was not readily determinable and, thus, the debt remained unliquidated, on the Petition Date. While Smith's liability to the SEC had been established on the Petition Date—by way of the Summary Judgment Order—the Final Pretrial Order makes clear that there were a number of remedies issues remaining to heard by the District Court at trial.

Among others, these included: (1) whether Continental should be required to disgorge its ill-gotten gains and, if so, in what amount; (2) whether Scioto should be required to disgorge its ill-gotten gains and, if so, in what amount; (3) whether Smith should be held jointly and severally liable for the ill-gotten gains of Continental and Scioto as a control person pursuant to 15 U.S.C. § 20(a); (4) whether, in the event that Smith was not found jointly and severally liable for disgorgement of the ill-gotten gains of Continental and Scioto, he should be required to disgorge his personal ill-gotten gains and, if so, in what amount; (5) whether a civil penalty should be imposed against Smith and, if so, in what amount; and (6) whether Smith and the other defendants would be required to pay prejudgment interest on amounts ordered disgorged, and, if so, at what rate. *See* Final Pretrial Order at 20–21. As explained below, resolution of each of these remedies issues required the District Court to exercise judgment and discretion rather than simply make an arithmetic calculation.

As the Final Pretrial Order recites, the threshold remedies issue for the District Court was whether to order the corporate defendants controlled by Smith—Continental and Scioto—to disgorge their ill-gotten gains and, if so, in what amount.[8]

7. The SEC appealed the bankruptcy court's decision denying its motion to dismiss, but later reached an agreement with the debtor to compromise its claim and dismissed the appeal. *See Svoboda*, Case No. 04–82284, Joint Motion to Compromise, filed April 25, 2006 (Tex.Bankr.Ct.Doc. 125).

8. Disgorgement is an equitable remedy imposed to " 'depriv[e] a wrongdoer of his unjust enrichment and ... deter[] others from violating the securities laws.' " *SEC v. Thorn*, 2002 WL 31412439 at *3 (S.D.Ohio Sept. 30, 2002) (quoting *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C.Cir.1989)). As the Sixth Circuit has noted, "[t]he purpose of disgorgement is to force a defendant to give up the amount by which he was unjustly enriched rather than to compensate the vic-

tims of fraud." *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985) (internal quotation marks omitted). Courts are unable to determine with exact precision the amount of gain a defendant may receive from his fraud. Thus, " 'disgorgement need only be a reasonable approximation of profits causally connected to the violation.' " *Thorn*, 2002 WL 31412439 at *3 (quoting *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341 at *2 (S.D.N.Y. Aug. 23, 2002)). The SEC must demonstrate that "the disgorgement sought approximates the amount of unjust enrichment." *Id.* The burden then shifts to the defendant to prove that "the amount is not accurate ... [and] that the amount received is less than the full amount sought." *Id.* (citation omitted). *See also SEC v. Mohn*, 2005

*See id.* at 20. Because Smith had been found to be a control person in the Summary Judgment Order, the District Court had the option of holding him jointly and severally liable for the ill-gotten gains of Continental and Scioto or, alternatively, requiring disgorgement of his personal ill-gotten gains only. *See id.* at 21; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir.1996) ("[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order.").

██ Case law makes clear that a district court has broad discretion to use its equitable powers to craft an appropriate disgorgement remedy. *See SEC v. Namer*, 183 Fed.Appx. 120, 2006 WL 1541378 at *1 (2d Cir. June 1, 2006) ("A district court enjoys broad discretion in fashioning a disgorgement remedy."); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) ("The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws."); *First Jersey*, 101 F.3d at 1474–75 ("The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."); *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir.1996) ("The decision to order disgorgement of ill-gotten gains, and the

calculation of those gains, lie within the discretion of the trial court, which 'must be given wide latitude in these matters.'" (quoting *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir.1995))). Such discretion includes "not only ... determining whether or not to order disgorgement but also ... calculating the amount to be disgorged." *Svoboda*, 409 F.Supp.2d at 344 (internal quotation marks omitted). *See also SEC v. Sunbelt Dev. Corp.*, 2006 WL 519769 at *3 (W.D.La. Mar. 2, 2006) (district court has "broad discretion" to determine if disgorgement should be ordered and, if so, in what amount). And, as one reported decision notes, "[d]istrict courts enjoy so much latitude in these matters that a decision not to order disgorgement will not be disturbed by an appellate court unless it is established that the district court abused its discretion." *SEC v. Merchant Capital, LLC*, 400 F.Supp.2d 1336, 1373 (N.D.Ga. 2005).

The SEC argues that—particularly in fraudulent offering cases—courts rarely exercise their discretion to order disgorgement in an amount less than that requested by the SEC. That may well be true. Many courts have opted not to reduce an SEC request for disgorgement of ill-gotten gains. *See, e.g., Svoboda*, 409 F.Supp.2d at 345 (declining to reduce disgorgement amount sought by the SEC because defendants failed "to demonstrate that they received less than the full amount sought to be disgorged"); *Lorin*, 76 F.3d at 462 (upholding district court's order requiring disgorgement of all profits and rejecting appellant's argument for limiting disgorgement to profits from sales to other parties); *Sunbelt Dev. Corp.*, 2006 WL 519769

WL 2179340 at *3 (E.D.Mich.2005) ("Although the SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment, a defendant may come forward with evidence that the disgorgement figure

was not a reasonable approximation." (internal quotation marks omitted)). In this district, "[f]inancial hardship does not preclude the imposition of an order of disgorgement." *Thorn*, 2002 WL 31412439 at *3.

at *3 (ordering disgorgement in amount requested by SEC based on finding that SEC had met its burden of reasonable approximation and debtor failed to demonstrate inability to pay). But, despite the SEC's suggestion to the contrary *(see* SEC Final Br. at 11), it is simply not true that courts have "uniformly" declined to exercise their discretion in a manner that results in reduction of an SEC disgorgement request. *See, e.g., SEC v. Johnson,* 2006 WL 2053379 at *1 (S.D.N.Y. July 24, 2006) (ordering disgorgement and imposing civil penalties in amounts less than that requested by the SEC and finding "the SEC's proposals to be too severe and [the defendant's] proposals too mild"); *SEC v. Pardue,* 367 F.Supp.2d 773, 778 (E.D.Pa. 2005) (although SEC requested disgorgement of approximately $140,000 and imposition of a civil penalty in the same amount, district court ordered disgorgement of $25,000 and imposed a $25,000 civil penalty based on the fact that "the Internal Revenue Service and the stock market declines since 2000 ha[d] deprived [the defendant] of the benefits of the [illegal insider] transaction").

 If the remedies phase of the trial had gone forward, the District Court also would have had to determine whether to award prejudgment interest on any disgorgement amount. This too would have required the exercise of discretion, not simply a mathematical computation. *See First Jersey,* 101 F.3d at 1476 ("The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion." (internal quotation marks omitted)); *Svoboda,* 409 F.Supp.2d at 345 ("A district court has broad discretion to decide whether to assess prejudgment interest and the rate used in calculating such interest."); *Thorn,* 2002 WL 31412439 at *4 ("As to the SEC's request

for prejudgment interest on the amount ordered to be disgorged, the Court observes that any such award is within the Court's discretion."). In determining whether to award prejudgment interest in an SEC civil enforcement action, courts generally consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey,* 101 F.3d at 1476 (internal quotation marks omitted); *Thorn,* 2002 WL 31412439 at *4 (same). Balancing these factors would, of necessity, require the exercise of judgment and discretion. Thus, "[s]imple mathematics alone ... [would] not supply the value of [this component of the SEC's] claim." *Horne,* 277 B.R. at 326.

 The District Court also would have been required to exercise discretion in passing upon the SEC's request for the imposition of a civil penalty against Smith. As the District Court stated in its Final Pretrial Order: "Courts have *broad discretion* in determining the appropriate amount of any penalty. Pursuant to statute, the amount [of the civil penalty] should be determined in light of the 'facts and circumstances' surrounding the violations." Final Pretrial Order at 12 (emphasis added) (quoting 15 U.S.C. § 78u(d)(3)). The SEC sought the imposition of civil penalties under § 20(d) of the Securities Act (15 U.S.C. § 77t(d)) and § 21(d)(3) of the Exchange Act (15 U.S.C. § 78u(d)(3)). These remedy provisions "categorize[ ] penalties into three tiers of increasing severity." *See SEC v. Lybrand,* 281 F.Supp.2d 726, 730 (S.D.N.Y.), *aff'd sub nom. SEC v. Kern,* 425 F.3d 143 (2d Cir. 2005). Had the trial gone forward, the District Court would have been required to

determine whether to grant the SEC's request for imposition of a "third-tier" civil penalty. Third-tier penalties are available if the violation in question "involved 'fraud, deceit, manipulation or a deliberate or reckless disregard of a regulatory requirement [and the violation] resulted in substantial losses or created a significant risk of substantial losses to other persons.'" *Id.* (quoting 15 U.S.C. §§ 77t(d), 78u(d)(3)); *Mohn,* 2005 WL 2179340 at *7; *Thorn,* 2002 WL 31412439 at *4 (quoting 15 U.S.C. § 77t(d)(2)(C)(I), (II)). Factors that courts weigh in imposing those penalties include:

> (1) the egregiousness of the violations at issue[;] (2) defendants' scienter[;] (3) the repeated nature of the violations[;] (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*Lybrand,* 281 F.Supp.2d at 730. *See also Mohn,* 2005 WL 2179340 at *7. Application of this multi-factor test to the facts and circumstances surrounding Smith's violations of the securities laws clearly would have required the exercise of judgment and discretion by the District Court, not simply a mathematical computation. *See Lybrand,* 281 F.Supp.2d at 729 ("District courts have discretion in determining the appropriate amount of any penalty."); *SEC v. Moran,* 944 F.Supp. 286, 296–97 (S.D.N.Y.1996) ("Considering the discretionary nature of the civil penalty framework, prior decisions and consent decrees are of little comparative value for any individual matter. Each case, of course, has its own particular circumstances which determine the appropriate penalty to be imposed.").

To summarize, as the Final Pretrial Order makes clear, in order to fix a damage amount to award the SEC, the District Court would have been required to decide: (1) whether to order the corporations controlled by Smith—Continental and Scioto—to disgorge their ill-gotten gains and, if so, in what amount; (2) whether to hold Smith jointly and severally liable for disgorgement of the ill-gotten gains of Continental and Scioto as a control person pursuant to 15 U.S.C. § 20(a); (3) whether, in the event that the District Court declined to hold Smith jointly and severally liable for the disgorgement of the ill-gotten gains of Continental and Scioto, it should order that Smith disgorge his personal ill-gotten gains and, if so, in what amount; (4) whether to assess prejudgment interest on any amounts ordered disgorged and the rate to be used in calculating the interest; and (5) whether to impose civil penalties against Smith and, if so, in what amount. Each decision point in this process called for the District Court's exercise of judgment and discretion, rather than a simple mathematical calculation.

In support of the contention that the amount of its claim was readily determinable on the Petition Date, the SEC advances several arguments, none of which is meritorious. First, the SEC argues that, in the District Court action, Smith had agreed to—or alternatively, did not dispute—the amount that he would be required to disgorge. *See, e.g.,* SEC Reply Br. at 1–2 ("[T]he Debtor had already filed a joint proposed final pretrial order concerning remedies in which Debtor did not dispute the amount of disgorgement that Debtor owed to the SEC.... [A]s of the Petition Date the parties had agreed as to the disgorgement amount that flowed from the court's fraud finding."). Although the SEC repeats this assertion throughout the briefing—*see* SEC Reply Br. at 1, 2, 5, 6, 7, 8—it is simply not true. Granted, there

was no dispute between the parties as to the total amount raised in the Continental and Scioto offerings. The Final Pretrial Order states: "For the Continental [o]ffering, the total amount raised was[ ] $1,272,655. For the Scioto offering, the total amount raised was $798,000." Final Pretrial Order at 10. But the Proposed and Final Pretrial Orders make clear that, as of the Petition Date, Smith and the corporate defendants had not agreed to a disgorgement amount, and this issue remained in dispute. *See* Proposed Pretrial Order at 21; Final Pretrial Order at 20–21. The ultimate agreement between the parties as to a disgorgement amount came nearly two months after the Petition Date, with the submission of the Stipulation and Final Judgment. *See* Dist. Ct. Doc. 100, 101.

The SEC also attempts to establish that its claim was liquidated on the Petition Date by urging the Court to focus solely on the disgorgement component of its claim. The SEC does not dispute the fact that, in determining whether to impose a civil penalty against Smith (and, if so, in what amount) and whether to award prejudgment interest (and, if so, at what rate), the District Court necessarily would have been required to exercise discretion. But despite the fact that the District Court would necessarily have been required to exercise judgment and discretion to quantify these elements of the SEC's claim, the SEC maintains that its disgorgement claim alone would cause the Debtor to exceed § 109(e)'s eligibility threshold and, thus, that portion of its claim was in fact liquidated on the Petition Date. This argument is unavailing. As previously explained, the premise underlying the SEC's argument— that the disgorgement component of its claim had been fixed and was thus readily determinable on the Petition Date—is flawed. While the total amount raised by the Continental and Scioto offerings indeed "ha[d] been adjudicated down to the

penny" as the SEC contends, *see* SEC Final Br. at 10, the amount that the District Court ultimately would order Smith to disgorge following the trial on remedies was neither known nor readily determinable on the Petition Date.

Nor is the Court persuaded by the SEC's contention that "courts use very little discretion in awarding disgorgement in offering fraud cases." SEC Final Br. at 2. As discussed above, while it may be true that federal courts typically do not exercise their discretion to order disgorgement in an amount less than that requested by the SEC, the fact remains that they retain the discretion to do so if deemed appropriate in a particular case. *See First Jersey*, 101 F.3d at 1474–75 ("The district court has broad discretion *not only in determining whether or not to order disgorgement* but also in calculating the amount to be disgorged." (emphasis added)); *Svoboda*, 409 F.Supp.2d at 344 (same); *Johnson*, 2006 WL 2053379 at *1 (ordering disgorgement and imposing civil penalties in amounts less than requested by the SEC); *Pardue*, 367 F.Supp.2d at 777 (same). In short, contrary to the SEC's suggestion, it was simply not a foregone conclusion on the Petition Date that the District Court would require Smith's full disgorgement of all proceeds raised from the Continental and Scioto offerings. Had this been the case, a four-day trial on the remedies issues—in which over a dozen witnesses were to be called and more than one hundred exhibits admitted— would not have been necessary. *See Pearson*, 773 F.2d at 756 ("[T]he fact that evidence must be taken to determine the amount of the claim indicates that, until then, the claim was unliquidated.").

As of the Petition Date, then—given the outstanding remedies issues not yet presented to or decided by the District Court—the amount of Smith's debt to the

SEC was not readily calculable and thus remained unliquidated. The SEC's claim accordingly will not be counted in determining Smith's eligibility under § 109(e). Smith therefore qualifies for relief under Chapter 13 of the Bankruptcy Code.

### D. Bad Faith

Having concluded that the amount of the SEC's claim was not readily determinable on the Petition Date, the Court finds that Smith did not act in bad faith by listing the debt as unliquidated and its amount as "unknown" in the Schedule F that he filed with his petition.

### IV. Conclusion

For these reasons, the Court will enter a separate order denying the Dismissal Motion. A hearing to consider confirmation of the Debtor's Chapter 13 plan will be held on February 20, 2007 at 2:00 p.m. in Courtroom A.

**IT IS SO ORDERED.**